UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C. A. NO. 03-12502 NMG

HARTFORD FIRE INSURANCE COMPANY, )
    Plaintiff )
 )
 )
vs. )
 )
EASTERN CONTRACTORS, INC., )
    Defendant/Third Party Plaintiff )
 )
vs. )
 )
CITY OF LAWRENCE, CITY OF FALL RIVER )
and FREETOWN/LAKEVILLE REGIONAL )
SCHOOL DISTRICT, )
    Third Party Defendants )

**EASTERN CONTRACTORS, INC.'S MEMORANDUM IN OPPOSITION
TO HARTFORD FIRE INSURANCE COMPANY'S MOTION FOR
PARTIAL SUMMARY JUDGMENT**

### IDENTIFICATION OF PARTIES

1. Eastern Contractors, Inc. (hereinafter "Eastern") was the General Contractor on seven (7) public construction projects on which S & R Construction Inc. (hereinafter "S&R") had been engaged as a Subcontractor to perform site preparations, excavation, paving, foundation, excavation, and utility work including sewer, water, drain, detention ponds/septic systems, and related work.

2. Eastern executed separate subcontracts with S&R for excavation, utility construction and site preparation work at such public construction projects.

3. Hartford Fire Insurance Company (hereinafter "Hartford") was the compensated surety on bonds supplied by S & R to Eastern for the subcontracts on the projects in question.

## IDENTIFICATION OF PROJECTS

| Name | Orig. Contract Amt. | Change Orders | Final Contract Value |
|---|---|---|---|
| 1. Lynnfield | $1,487,000 | $163,095 | $1,650,095 |
| 2. New Bedford | $1,450,000 | $295,145 | $1,745,145 |
| 3. Fall River | $1,648,000 | $774,938 | $2,422,938 |
| 4. Lawrence | $1,050,000 | $254,262 | $1,304,262 |
| 5. Freetown | $1,770,000 | $320,432 | $2,090,432 |
| 6. Waltham | $1,065,000 | $1,721,235 | $2,786,235 |
| 7. Medway* | $3,275,000 | $182,752 | $3,457,752 |

(* claims by Eastern for the Medway Project were settled in approximately July of 2003 by payment from Hartford to Eastern. Medway is not in dispute in this Litigation.)

## ISSUES RELATING TO SUMMARY JUDGMENT

Hartford has filed a motion for partial summary judgment in connection with three (3) of the above-referenced projects, namely Lynnfield, New Bedford (sometimes referred to as the Normandin School), and the Fall River projects (sometimes referred to as the Spencer Borden and William Greene Schools).

Hartford contends that it has been discharged and released from its bond obligations at the Lynnfield and New Bedford projects by reason of the surety's claim that: 1) Eastern failed to declare S & R in default; and 2) a certain agreement made by and between Eastern and S & R, Hartford's principal, on January 9, 2003 eliminating the obligation to complete unfinished work, denied Hartford the opportunity to complete work at that project, and deprived Hartford of the opportunity to exercise one of its options under the performance bond.

With respect to the Fall River Project, Hartford claims that it expended funds equal to or greater than the penal sum of its bond on the Fall River Project and thus has no further obligations under such bonds.

Eastern submits that there are genuine issues of material fact and substantial questions of law relating to the claims of discharge for the Lynnfield and New Bedford Projects, as well as the claim by Hartford that it expended the penal sum of the bonds on the Fall River Project and others.

### SUMMARY STATEMENT - LYNNFIELD AND NEW BEDFORD

With respect to the Lynnfield and New Bedford Projects, Eastern submits that the evidence obtained on partially completed discovery establishes the existence of genuine issues of material facts and questions of law which may be summarized as follows:

1. Eastern issued a notice of default in September of 2002, and notwithstanding Eastern's efforts to cooperate with S & R and Hartford, such notice was never withdrawn, waived, abandoned or vitiated.

2. S&R continued to be in default following such notice and commit acts which were in breach of the subcontract, of which Hartford was aware.

3. Eastern and S & R reached an agreement on January 9, 2003 which had the effect of amending the subcontract by deleting certain work necessary to complete the subcontract and adjusting the contract price accordingly. Such agreement was a permitted modification of the subcontract, and did not increase Hartford's liability under its bonds, nor did such agreement prejudice Hartford which exercised its rights as of February 7, 2003 directing Eastern not to make any further payments to S & R without the consent of Hartford.

4. Hartford, by its conduct and its express communications, accepted, adopted ratified and confirmed the January 9, 2003 agreement between S & R and Eastern and received the benefits of same.

## SUMMARY STATEMENT - FALL RIVER

With respect to the Fall River Project, Eastern respectfully submits that a summary of issues of material fact and questions of law is as follows:

1. There are genuine issues of material fact as to modifications and increases in the penal sum of the bonds for the Fall River Project, and also for the Lynnfield, New Bedford and Lawrence Projects. Evidence obtained during discovery from Hartford's internal documents shows an increase in the penal sum of the Hartford bond for the Fall River Project in the amount of $589,161.00. As so modified, the penal limits exceed the amounts Hartford claims to have paid by nearly $500,000.00.

2. The amounts which Hartford claims to have expended at the Fall River Project are uncertain and have not been established. The recitation of amounts expended by Hartford at the Fall River Project are not substantiated, and upon deposition testimony, Hartford's affiant, Gary Judd, acknowledged that he had no personal knowledge regarding what work was performed and that the amounts referred to in his affidavit were merely a summary of a check register.

3. Prevailing wage records obtained from the City of Fall River relating to work performed by Hartford, which were required to be filed both by law and by the terms of the takeover agreement, establish substantially less manpower

present at the project site during the time periods claimed by Hartford, which raise genuine questions of material fact as to the amount of actual work performed and the amount for which Hartford paid. In essence, the surety is not permitted to permit economic waste and dissipation of the penalty sum of the bond by failing to adequately monitor the completion of work which was within its control.

4. There are genuine issues of material fact as to the actual work performed. Hartford chose to use a newly created entity (R.O.C. Construction Company, Inc.) which was a reincarnated version of the defaulting principal (S & R) to perform work at Fall River on a time and materials basis. Hartford was aware that costs were running higher than anticipated, and was also aware that the business practices of S&R and its principals frequently included overbilling project owners. There are genuine issues of fact regarding the actual work which was performed, and Hartford has not established that the payments claimed are for actual work in excess of bond limits.

LAW AND ARGUMENT – LYNNFIELD AND NEW BEDFORD

Eastern submits that Hartford was fully aware of S&R's default on the Lynnfield and New Bedford Projects and failed to exercise any of its options under the performance bond. Discovery partially completed to date clearly establishes that notices of default of S & R were issued to Hartford on September 16th and September 24th of 2002, on behalf of Eastern, which default notices were never canceled or withdrawn. (See Exhibits H and I, and deposition testimony of Gary Judd, page 80 and page 81, Exhibit B.) Discovery partially completed to date has also revealed that Hartford was aware of claims activities

concerning S & R and problems with performance on projects involving S & R during October through December 2002, both with Eastern and another general contractor named Bowdoin Construction. (Deposition testimony of Gary Judd, pages 38, 39, 40 & 41, Exhibit B.) Hartford placed S & R on its "Observation list" in October of 2002 (see Exhibit I, Jarvis deposition and Rule 30(b)(6) deposition testimony of Hartford by Gary Judd, pages 36 and 37, Exhibit B), and also began the process of taking steps in October 2002 to secure Hartford's rights and benefits under certain General Agreements of Indemnity executed by and between Hartford and the individual guarantors who had agreed to indemnify Hartford against liabilities incurred on account of S & R. (See Exhibit 6 and deposition testimony of Gary Judd, pages 43, 44, 45, & 46, Exhibit B.) Hartford was further aware of continuing events of default by S & R on Eastern bonded projects including Lynnfield and others which were occurring through December of 2002. (See deposition testimony of Gary Judd, pages 39-44 (Exhibit B), Exhibits 5 & 6 of Hartford's motion regarding claims of non-payment by S&R received from fuel supplier on Lynnfield, New Bedford and Medway Projects.) Non-payment of subcontractors and suppliers was one of the several grounds of S&R's default set forth in Eastern's notice of September 24, 2002. (See also contract general conditions Article 14.2 attached to Motwane affidavit binding upon S&R and its surety which provides that non-payment of subcontractors and suppliers is a default which may permit termination of a contract.)

On February 7, 2003, Hartford took the step of notifying Eastern not to make any further payments to S & R without securing the consent and approval of Hartford (see Exhibit 39 to Exhibit F). Hartford's Claims Attorney describes this as "an extraordinary act by a surety usually prompted by extraordinary circumstances" (see Exhibit F, page

313, lines 9-11). The purpose of the notice was to protect Hartford's interest (see Exhibit B, page 52 and page 53). By early February 2003, Hartford's representatives had been approached by S&R for financial assistance (see Exhibit 32 to Exhibit F and Exhibit 3 to Exhibit B), lending to the argument that Hartford was fully aware of S&R's troubled bonding history.

Hartford's summary judgment motion with respect to the Lynnfield and Normandin Projects is predicated upon a claim that Eastern failed to declare a default and allegedly denied the surety the opportunity to exercise any of its options under the performance bond. Hartford ignores, however, the clear language set forth in the September 24, 2002 notification which clearly states, consistent with the requirements of the form of bond and the contract conditions, that in fact S & R was in default and declared to be such by Eastern, the obligee under the bond:

> "Eastern has been advised that S & R has breached its subcontract obligations on the above referenced projects in numerous respects by failing to manage and supervise such projects properly; failing to make payments to subcontractors, suppliers, material men and others which failure of payments not only jeopardizes progress and performance of the subcontract, but also creates contingent liability exposure to Eastern, and its surety on payment bonds issued for the projects. Eastern has been contacted repeatedly by suppliers and subcontractors who have advised Eastern of nonpayment by S & R for materials, services and supplies for the projects and in the number of instances and have informed Eastern's representatives that scheduled work will not be performed because of amounts outstanding for previous work. Eastern has also been informed of labor disruptions relating to failure of payment for union benefits and has also been advised by a number of subcontractors, truckers and suppliers that checks issued in payment by S & R for work relating to Eastern's projects have not been honored by S & R's bank....
>
> All of the foregoing constitute events of default under the subcontract obligations existing between S & R and Eastern. Eastern makes demand of S & R and Hartford Insurance Company and surety on bonds issued for the projects, to cure these defaults, furnish Eastern with an up-to-date and accurate summary of vendors, vendor payment records and other financial matters relating to the performance on all subcontracts between S & R and Eastern, to provide proper

supervision manpower and management of these projects and remedy failures to adhere to project schedules and otherwise fulfill the obligations under the subcontract."   (See September 24, 2002 letter, Exhibit 2 Morelewicz to Hartford's motion).

The foregoing clearly establishes notice to Hartford that S & R was in default of its subcontract obligations, and was declared as such by Eastern. The decisions of Elm Haven Construction Limited Partnership vs. Neri Construction LLC, 376 F. 3rd 96, 2nd Cir. (2004) and L & A Contracting vs. Southern Concrete Services, Inc. 17 F. 3rd 106 (1994) cited by the Plaintiff are readily distinguishable from the factual circumstances found in the present matter. In both of those cases, the court found that the obligee's failure to provide notice was supported in significant part by the failure of the obligee to even use the word "default" in the notifications issued to the surety. Moreover, in the L & A Contracting case, supra, the general contractor permitted the subcontractor to cure repetitive defaults, and in fact the subcontractor in L & A Contracting actually completed the work in question and the claim against the surety related to delay in performance. In the present case, the opposite occurred, as S & R's defaults and events of breach of its subcontracts continued to occur, a circumstance of which Hartford was aware. (See Exhibits 4, 5 and 6 to Exhibit B.)

Hartford took steps to secure its interests under its agreements of indemnity with the principals of S & R and advise those principals of their obligations of indemnity. Furthermore, on February 7, 2003, Hartford (prior to what it characterizes as the default date) took steps to notify Eastern not to make any further payments to S & R without the consent and approval of Hartford. (See Exhibit 39 to Exhibit F.)   Such conduct is contrary to Hartford's assertions that it was deprived of opportunities to avail itself of remedies available under the bond.

The sufficiency of the notice of default of September 24, 2002 issued by Eastern is consistent with Massachusetts law which has long held that in the absence of a provision in the bond to the contrary, it is up to the compensated surety to keep itself informed of any defaults on the part of the principal, and it is not the task of the creditor to inform and give notice to the surety. See <u>John W. Egan Company, Inc. vs. Major Construction Management Corporation, et al</u>, 46 Mass. Appeals Ct. 643, 709 N.E.2nd 66 (1999). Eastern's notification declaring S & R in default and making a demand against Hartford to cure such defaults under the performance bond is more than adequate notice to satisfy the requirements of the bond and applicable law.

A number of cases have distinguished the holding in <u>L & A Contracting</u> including <u>DCC Constructors, Inc. vs. Randall Mechanical, Inc.</u>, 791 So. 2nd 575 (2001), in which the distinction was noted as follows:

> "However, <u>L & A Contracting</u> is distinguishable. The Fifth Circuit held that there was a need for a clear, direct declaration of default by the general contractor in order to inform the surety that its principal is in material breach of its obligations under the subcontract. In that case the general contractor gave multiple notices to the subcontractor and surety of the subcontractor's repetitive defaults and after each notice, the subcontractor would cure the default. The decision, while indicating that a legal default exists when a material breach is committed of such seriousness that it would justify termination of the subcontract, does <u>not</u> hold that liability under a performance bond only occurs when the general contractor actually terminates the subcontract. 791 So. 2nd, 575@577. [Emphasis supplied.]

Contrary to Hartford's contentions, the arrangement reached between Eastern and S & R in January 2003 concerning the Lynnfield and New Bedford projects is not a release and discharge but is consistent with permitted amendment to the subcontract which has not increased any liability of Hartford as the surety, nor caused Hartford any prejudice. The January 9, 2003 arrangement (Exhibit A, Affidavit of Ramesh Motwane)

calls for a modification in the subcontract obligations between Eastern and S&R by eliminating S&R's responsibility to complete certain work at the Lynnfield and New Bedford Projects, permitting Eastern to use the then remaining balance of subcontract funds to complete the work deleted from the Subcontract. The subcontract agreement between Eastern and S & R and the terms of the general contract conditions incorporated by reference therein, permit changes in the contract for the addition or deletion of work with appropriate adjustments in the contract price. (See Exhibit A, Affidavit of Ramesh Motwane.)

In Massachusetts, the rule with respect to a compensated surety is that such surety is discharged by a change or modification to the underlying contract, only to the extent that such surety is harmed by the change. Bayer & Mingolla Construction Co. vs. Deschenes, 348 Mass. 594; 205 N.E.2nd 208 (1965). Contrary to the assertions of Hartford, there was no "release" of S & R, since S&R, and by extension Hartford as its surety, merely remained responsible for work performed up to the date of such amendment, consistent with the obligations under the subcontract. Changes in the subcontract are permitted, and whether Hartford has been prejudiced presents a genuine issue of material fact. The operative change in any obligation or liability of S & R and Hartford which results from the January 9, 2003 arrangement, is a reduction in the scope of work which also had the effect of reducing the surety's liability exposure. In order to establish that Hartford as a compensated surety is discharged from its obligations under the bonds issued for Lynnfield and New Bedford, Hartford must demonstrate that the modification materially increased Hartford's risk. Town of Hingham vs. B.J. Pentabone, Inc., 354 Mass. 537; 238 N.E.2d 534 (1968); see also Bayer & Mingolla Construction

Co. vs. Deschenes, 348 Mass. 594; 205 NE2d 208 (1965); Maryland Casualty Co. vs. Dunlap, 68 F2d. 289, 291 (1st Cir 1933); Leila Hospital and Health Center vs. Xionics Medical Systems, Inc., 948 F2d 275, "surety must also demonstrate material departure from the contract resulted in some injury to the surety."

Hartford's attempts to rely upon the Seaboard Surety Company vs. Town of Greenfield case, 370 F 3rd 215, 1st Cir (2004) is misplaced. That case involved a completely different form of bond, Form 312 AIA, which form has extensive requirements for written notification of an intent to declare a default, obligations to conduct a conference to discuss methods of performing the contract with fifteen (15) days notice, and that the owner must have formally terminated the Contractor's right to complete the contract not earlier than twenty (20) days after the contractor and surety have been given notice of an intent to terminate. In the Seaboard Surety Co. case, the court found that the obligee failed to afford the surety the required fifteen (15) days in which it may attempt to cure the alleged breach prior to default and thus minimize economic exposure. (370 F 3rd 215, 223, 224.) The Court in the Seaboard Surety case held that the notices which were given were not sufficient because they failed to provide clear, direct and unequivocal notice that the fifteen (15) day cure period had commenced. (Id. at 223, 224.)

The bond form in question in this matter involving Hartford and Eastern is far simpler, and does not require any specific form of notice nor specify any specific time within which such notice must be given. The A-311 Bond form executed by and between Hartford and Eastern does not provide for specific opportunities to cure, or specific time notifications prior to default and termination. It does provide that Eastern as the Obligee

may arrange for the performance of S&R's obligation after reasonable notice to the surety. The bond is silent as to the degree of specificity of such notice and the facts establish that the surety was aware of the January 9, 2003 arrangement as early as February 4, 2003 (see Exhibit B) before the remaining work was completed (see Exhibit A, Affidavit of Ramesh Motwane) without protest or objection. See <u>Colorado Structures Inc. vs. Insurance Company of the West, et al,</u> 106 P 3rd 815 (2005) for a detailed analysis of the rights and remedies of the obligee and surety under the A-311 bond which distinguishes the holding in <u>L & A Contracting, supra.</u>

The question of whether there has been an alteration of the surety's risk has been determined to involve genuine issues of material fact. (See <u>John T. Callahan & Sons, Inc. vs. Dykeman Electric Company, Inc</u>., 266 F. Sup. 208 at 237 (2003).)

In the case of <u>United States Fidelity and Guaranty Company vs. Braspetro Oil Services Company</u>, 369 F 3rd, 34 (2004), the Court of Appeals in the Second Circuit rejected the interpretation of the <u>L & A Contracting</u> case, supra, case urged by Hartford in this matter, holding that such decision simply found that the evidence was insufficient as a matter of law to establish a declaration of default where letters sent by the obligee general contractor did not even contain the word default and other correspondence did not contain an unequivocal declaration of default.

The court in the <u>Braspetro Oil</u> case, supra, further held sureties liable under performance bonds in circumstances where the obligees continued to permit the principal to perform work and make advance and direct payments for such work even after notice of default. The sureties had claimed that notice was insufficient and that payments made were prejudicial to the sureties' interests in remaining contract funds. The court noted

that the issue of surety consent to a change in contract obligations need not be expressly given, but may be implied from the surrounding circumstances or from the surety's conduct, including a failure to make objections or by inaction when presented with information and communications which the sureties later claimed as a basis for prejudice.

> "It is well settled that the law does not favor the indifferent, unseeing surety who fails to help himself. St. Paul Fire & Marine Insurance Co. v. Commodity Credit Corp., 646 F2d 1064, 1072-713 (5 Cir. 1981) and, as we have stated the policy behind surety bonds is not to protect the surety from its own laziness or poorly considered decision. Cam-Ful Industries v. Fidelity and Deposit Co., 922 F2d 156, 162 (2nd Cir 1991) (citation omitted). A surety cannot rest supinely, close his eyes and fail to seek important information and then seek to avoid liability under the guarantee by claiming he was not supplied with such information. In light of these principles and in view of the most reasonable probable construction of the surety's conduct under the circumstances, see Assets Realization Co., 226 N.Y. at 377, 123 NE 743, we conclude that the sureties consented to the amendments to the contracts and to the obligee's implementation and operation of the direct and advance payment system.

In footnote 21, the Braspetro Oil Court noted further that the District Court had also concluded that the sureties, in not objecting to the direct and advance payments had waived any objections to the direct and advance payments of which they had been informed. In that same decision, the court rejected contentions by the sureties that they sustained prejudice because the contract amendment and direct and advance payments reduced the surety's access to remaining contract funds. In so holding, the court noted:

> [w]hile the amendments and the direct and advance payments may have reduced the Surety's access to remaining contract funds to cover the costs of completion, those costs were directly reduced thereby relieving the Sureties of performance obligations that they otherwise would have had. 369 F. 3rd 34 at 64.

See also Argonaut Insurance Company vs. Town of Cloverdale, 699 F2d at 420 (1983), which notes that where unauthorized advances are expended for the purposes of completing a bonded contract, the amount at risk to the surety is therefore unaffected. See Ramada Development Co. vs. U. S. Fidelity and Guaranty Company, 626 F2d 517 at

522, 6th Cir. (1980), which held that a surety was not released to the extent of improperly paid funds because the contractor had applied the released funds to progress on the contract. It is submitted that in these circumstances the surety bears the burden of proving that it was prejudiced by the actions of the obligee. (See <u>United States vs. Reliance Insurance Company</u>, 799 F2d 1382 (9th Cir 1986); see also <u>Fidelity and Deposit Company of Maryland vs. County of Lake</u>, Civ. A. No. 97-6276, 2000 WL 347770 N.D. Ill April 3, 2000.)

The same general principles apply to the factual issues in the present matter, since the effect of the January 9, 2003 agreement reduced S&R and Hartford's performance obligations for completion of the work at Lynnfield and New Bedford, and there has been no showing that in fact the remaining subcontract balance was applied for any purpose other than completion of S & R's obligations for those projects.

Furthermore, as has been indicated in documents produced on discovery conducted to date as well as deposition testimony, Hartford accepted the benefits of the January 9, 2003 agreement, ratified and adopted those changes in the subcontract and confirmed in writing that it would proceed with regard to the Lynnfield and New Bedford Projects, consistent with the provisions of the January 9, 2003 agreement. (See Exhibit 33 to Exhibit F and Exhibit B at page 59.)

As set forth in further detail herein, Hartford, after it finally secured the services of a claims representative (Mr. Jarvis) to actively take over and handle the S & R files, acknowledged both to claimants and to Eastern that it was processing payments under its payment bond obligations for the Lynnfield Project in accordance with the January 9, 2003 agreement and would make adjustments in its accounts with Eastern based upon

amounts which may become due under Hartford's Performance Bond Obligations in accordance with the January 9, 2003 agreement. (See Exhibit F, pages 301, 302 and 303 and Exhibits 33 and 35 which not only acknowledge the existence of the January 9, 2003 arrangement, but further confirm that payments being made by Hartford to a supplier may be adjusted by amounts which may become due to Eastern on the Lynnfield and Normandin Projects under the performance bond obligations.) (See Exhibit F at pages 304, 305 and 306 in which Hartford adjusts amounts to be paid to a curbing supplier on the Lynnfield Project based upon previous payments made by Eastern as reflected in the January 9, 2003 arrangement.)

Eastern submits that there are genuine issues of material fact which tend to establish that Hartford adopted, ratified and confirmed its acceptance of the January 9, 2003 subcontract amendment (see Exhibit 38 to Exhibit F at pages 306, 307, & 308), acted in accordance and consistent with such arrangement, and did not object to such arrangement during the investigation and processing of claims relating to the performance bonds and payment bonds issued by Hartford in favor of S & R, nor did Hartford make any demand to be permitted to complete the work at the Lynnfield and New Bedford Projects. (See Exhibit F, page 308, lines 7 through 16.)

On February 7, 2003, Hartford wrote to representatives of Eastern with a request that Eastern not release any further payments to S & R without Hartford's consent and approval. (See Exhibit 39 to Exhibit F.) Williams Jarvis, the Hartford Surety Claims Attorney, characterized such notice as an extraordinary act by a surety prompted by extraordinary circumstances. (See Exhibit F, pages 310 through 314.)

Therefore, it is apparent that Hartford was fully aware of S&R's defaults on the Projects in question, but failed to take steps to exercise its options under the bond.

## LAW AND ARGUMENT - FALL RIVER

With respect to the Fall River Projects (which consisted of two (2) separate sites: the Spencer Borden School and the William Greene School), Eastern respectfully submits that there are also genuine issues of material fact and questions of law which preclude entry of summary judgment based upon Hartford's claim that the penal sum of the bonds has been exhausted.

As will be set forth in further detail below, discovery to date has revealed that the penalty limits of the bonds appear to have been modified to reflect increases by change orders in the contract documents. Internal records of Hartford produced during discovery clearly state that the penal sum was increased on the Spencer Borden portion of the Fall River Project by the amount of $589,161.00, increasing the penal sum limit of such bond from $1,173,000.00 to $1,762,161.00. (See Exhibit F; Exhibit B, Underwriting Documents from Hartford and Exhibit B.) Similar documents containing the same statements, i.e., that the penal limit was increased for bonds on the Lynnfield and Lawrence Projects also were obtained on discovery and marked in the deposition of Williams Jarvis as Exhibits 17, Consent of Surety; Exhibit 18, Cheat Sheet documents for the Lynnfield Project; Exhibit 19, Consent of Surety; and Exhibit 20, Policy Transaction Details (Lawrence Project), all of which are Hartford documents which on their face state that the bond limits have increased. (See Exhibit F, pages 211, 212, 213, 214, 215, 216, 217 and 218, where the witness acknowledges that the documents being marked as Exhibits 17 - 20 each recite that the bond limits have increased. This same

witness also acknowledges that he has experienced instances where penal sums of performance and payment bonds have increased based upon change orders issued. (See Exhibit F, page 90, lines 17 – 24 and page 91, lines 1 - 2.)

A separate set of documents for the Normandin School Project in New Bedford was marked as Exhibits 6 and 7 in the deposition of James Morelewicz, which state that the penal sum of the performance and payment bonds was increased by the sum of $302,156.00. On Exhibit 7, there are handwritten notations which state "Bond $1,752,156" which is the total after the amount of the increase shown on Exhibit 6 is added to the base contract.

An affidavit from the agent who arranged for such bonds with Hartford confirms that Hartford not only billed for any increased premium on account of the increases in the contract sum but was paid by such agent for such amounts. (See Exhibit C, Affidavit of Donald Goodrich.)

Discovery and the deposition testimony of Gary Judd has revealed that, contrary to the statements set forth in his Affidavit offered in support of Hartford's motion for summary judgment, he has no personal knowledge with regard to actual expenditures at the Spencer Borden Project and the attachment made to his Affidavit was merely a recitation of check entries. Hartford's internal underwriting files confirmed the practice of S & R to overbill for work performed. (See Exhibit 10 attached to Exhibit F, a series of e-mails acknowledging the practice of S & R to overbill, and the financial problems such practice can create.)

The work undertaken by Hartford at the Fall River Project was contracted to a company known as R.O.C. Construction Company, Inc., which in Hartford's own

documents was described as merely a reconstituted entity of the original principal, S & R Construction. (See Exhibit 11 attached to Exhibit F in which Richard Divine, an engineer and employee of Hartford who prepared cost estimates for completion of certain projects, including Spencer Borden, responds to an e-mail from Mr. Morelewicz inquiring why costs at Spencer Borden are substantially more than the estimate. In response, Divine states as reasons that, "The project is being completed by the reincarnated principal whereas I contemplated a relet of the two Fall River projects as a package."

Furthermore, it was acknowledged by Hartford in its deposition testimony of Gary Judd that performing work on a Time and Materials basis is more expensive, and that Hartford did not advise Eastern as to the contractual basis upon which it was hiring R.O.C. (See Exhibit B, page 132, lines 4 - 17.)

Separate deposition exhibits consisting of handwritten notes of meetings held with representatives of S & R and Hartford confirm that full cooperation of S & R was dependent upon a waiver of indemnity obligations and award of completion contracts for Wetherbee (Lawrence) and Spencer Borden (Fall River) to R.O.C. on a time and materials (T&M) basis. (See Exhibit 2 Jarvis Deposition notes dated April 30, 2003; see Exhibit 4 Morelewicz Deposition.) Jarvis testified that obtaining cooperation from the principals of S&R was dependent upon releases from the personal indemnity agreement and being awarded contracts as R.O.C. Construction Company, Inc. for completion of work (see Exhibit F, pages 68, 69, 70, 71 72, & 73) which was hired by Hartford to perform this work without competitive bids. Exhibit 6 to the Jarvis deposition was an estimate of the costs to complete the Spencer Borden Project prepared by Hartford's consultant, Tony Branca, as of July 16, 2003, which estimated the costs to complete the

William Greene Elementary School in Fall River at $114,500.00 and the Spencer Borden School at $470,000.00 for a total of $584,500.00. Williams Jarvis testified that Hartford did not complete all of the work at the Fall River Project despite its claims that it spent more than $1,000,000.00 for that purpose (page 84, lines 5-10) with only minimal oversight to confirm that work was actually being performed. (See Exhibit F, page 84, lines 5 – 10 and pages 113 & 114 lines 23 – 2.)

The subcontract documents for the Fall River Project and the law applicable to public construction projects (G.L. ch. 149, §§ 26, 27) require that prevailing wages be paid for work on public construction projects, and that contractors file certified payroll reports with the awarding authority concerning the hours worked and the wages paid. Eastern through its counsel has secured copies of the wage reports submitted by R.O.C. Construction Company, Inc. as the contractor performing the completion work at the Fall River Project for the period of May through September 2003. (See Exhibit F, Affidavit of Magdalena Loret and attachments thereto obtained from the City of Fall River.) Those prevailing wage records reveal that R.O.C. Construction Company, Inc. worked only six (6) days in the month of May 2003, filed no reports for the entire month of June 2003 indicating that it did not have manpower performing work at that site for that month, and filed reports for ten (10) days worth of work in July 2003. The conflict in the required records and the unsubstantiated claims of amounts attributed to expenditures for this project further raise significant issues of fact which mitigate against summary judgment on the Fall River Project.

Hartford has failed to establish by credible evidence the amount actually expended at the Spencer Borden Project, and further the amount of the claimed

- 19 -

expenditures are less than the adjusted penal sum limit of the bond as described explicitly in Hartford documents obtained upon discovery.

Eastern respectfully submits, based on the materials which follow herein, that there are genuine questions of material fact, and as a matter of law Hartford is not entitled to partial summary judgment.

Respectfully submitted,
Eastern Contractors, Inc.
By its attorneys,

*Edward J. Quinlan*

Edward J. Quinlan, Esq., BBO # 409060
David T. Keenan, Esq., BBO# 567325
Quinlan & Sadowski, P.C.
11 Vanderbilt Avenue, Suite 250
Norwood, MA 02062-5056
Phone: 781-440-9909
Fax:   781-440-9979

Dated: December 22, 2005

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document was served on the attorney of record for each other party in this action, by mail, postage ... on 12-22-05.